State of Wisconsin, Plaintiff-Respondent,
v.
James Daulton, Defendant-Appellant.
No. 04-0232-CR.
Court of Appeals of Wisconsin.
Opinion Filed: November 2, 2004.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶ 1 PETERSON, J.
James Daulton appeals his judgment of conviction for first-degree intentional homicide in violation of WIS. STAT. § 940.01(1)(a).[1] Daulton argues there was insufficient evidence to convict him. We disagree and affirm the judgment.

BACKGROUND
¶ 2 On Friday, January 25, 2002, the body of seventy-one-year-old Joseph Gagetti was found in his home at the Hometown Village Apartments in Mercer. Gagetti had been severely beaten, sustaining blows to his head, face, arms and legs. The cause of death was blunt trauma, principally to the head and face. The coroner at the scene estimated Gagetti's time of death as early afternoon that day. A more exact time of death could not be determined because Gagetti's body temperature was not taken and his pacemaker was not examined until after its memory automatically cleared. Gagetti's watch, which was damaged and stopped at approximately 12:56 on Friday the 25th, was also recovered from the scene.[2]
¶ 3 Daulton had met Gagetti in June 2001, and the two lived in neighboring apartments. Daulton checked on Gagetti several times each day. He also frequently ran errands for Gagetti, who paid Daulton $10 or $20. Daulton called Gagetti his "hustle."
¶ 4 Daulton told the coroner and her assistant that about 5:45 p.m., he went to check on Gagetti. He found Gagetti's front door locked, which was unusual. He had an "eerie feeling," so he got Alice Watts, who was another resident of Hometown Village. Daulton and Watts went outside to Gagetti's open patio doors and saw Gagetti lying on the couch. They went inside, checked Gagetti for a pulse and found him dead.
¶ 5 Daulton gave different accounts of his discovery of Gagetti's body to several officers from the Iron County Sheriff's Department. While he told the coroner that he retrieved Watts upon finding the hall door locked, he told the officers that he first went to the patio door. Daulton told one officer that from the patio door he saw Gagetti lying on the couch with his arms up.[3] He told another that he found the patio door ajar, saw part of Gagetti's body, and got an "eerie feeling." He said he got Watts because he needed a witness.
¶ 6 On May 14, 2002, Daulton was charged with first-degree intentional homicide.[4] He pled not guilty, and a jury trial commenced on June 2, 2003. The State's case relied almost exclusively on circumstantial evidence. No physical evidence was collected that linked Daulton to Gagetti's death. No murder weapon was found, although numerous witnesses testified to seeing a memorabilia baseball bat at Gagetti's apartment and Dr. Michael Stier testified that the bat could have been used to inflict Gagetti's injuries.
¶ 7 At trial, the jury heard the various accounts that Daulton had given to the police and others of his whereabouts on the day of Gagetti's death. He said he brought Gagetti a newspaper between 8 a.m. and 8:30 a.m. He claimed he went to the grocery store at noon. Depending on the account, he last checked on Gagetti as early as noon or as late as 1:30 p.m. Daulton said he went out for a steak dinner at 2 or 2:30 p.m., returned home, then went to an automobile shop at 4 p.m. After that, he went out for a fish fry before returning to Hometown Village and finding Gagetti's body.
¶ 8 Other witnesses testified to Daulton's whereabouts on January 25. A neighbor saw Daulton leave through Gagetti's patio door between 12:30 and 1 p.m., which surprised her since Gagetti always had his patio door closed and locked. Another neighbor saw Daulton walking in the inside hallway of the apartments about 12:55 p.m. The jury heard testimony that Daulton had a steak dinner at the Anchor Inn around 1 p.m., was at the automobile shop between 3 and 3:30 p.m., made a purchase at the grocery store at 3:31 p.m., and had a fish dinner, arriving at Rugger's between 4 and 4:30 p.m. Watts testified that before she and Daulton went to Gagetti's apartment, Daulton told her he was washing clothes and needed to stop at the laundry area.
¶ 9 The jury also heard testimony about Daulton's unusual behavior on January 25. The coroner and her assistant testified that while they were in Gagetti's apartment that evening, Daulton told them at least fifteen or twenty times that Gagetti was an alcoholic and was always falling and hitting his head. Daulton appeared nervous, restless and agitated.
¶ 10 Richard Wilson, the owner of the Anchor Inn, testified that Daulton was a frequent customer and that it was unusual for him to order steak. Wilson also testified that Daulton paid for his steak and beer, which totaled $17 or $18, with a $100 bill. When Daulton ordered a second beer, he tried to pay first with another $100 bill and then with a $50 bill, neither of which Wilson could accept because he did not have sufficient change. Wilson observed that Daulton had a large number of bills in his wallet and appeared nervous.
¶ 11 An automobile shop employee testified that Daulton paid for a $90 battery with a $100 bill and told the employee to keep the change. The grocery store owner testified that Daulton paid for his purchase with a $50 bill. The waitress at the Anchor Inn testified that when Daulton had his fish dinner, he tipped her $10 before his dinner arrived and was sorting a large number of bills into piles on the bar.
¶ 12 Other financial evidence was introduced at trial. Near the time of Gagetti's death, Gagetti's savings account balance exceeded $20,000, while Daulton's had fallen to under $10. Daulton had another account that contained about $500. Daulton knew the location of Gagetti's cash box and knew Gagetti kept money in his apartment in the cash box and in other places.
¶ 13 The State also introduced evidence of Daulton's behavior after January 25. When new residents were moving into Hometown Village in February 2002, Daulton cautioned them to arm themselves with a baseball bat, gun or hatchet. When discussing Gagetti's death, Daulton stated, "I'd kill the SOB too to get the money." Daulton also gave police the names of four people who he believed might have killed Gagetti because they owed him money. The police eliminated those people as suspects.
¶ 14 Dr. Stier, who performed Gagetti's autopsy, testified that Gagetti was beaten with a minimum of thirty blows and that the attack likely took ten to twenty minutes. The nature of Gagetti's injuries, concentrated to the head and face, indicated a "rage attack" by someone who knew the victim. Stier also testified that someone of Daulton's size could have administered the beating.

STANDARD OF REVIEW
¶ 15 When determining whether there is sufficient evidence to support a conviction, "[t]he test is not whether this court or any of the members thereof are convinced [of the defendant's guilt] beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true." State v. Poellinger, 153 Wis. 2d 493, 503-04, 451 N.W.2d 752 (1990). We view the evidence in the light most favorable to the conviction. State v. Burroughs, 2002 WI App 18, ¶ 14, 250 Wis. 2d 180, 640 N.W.2d 190. "It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Poellinger, 153 Wis. 2d at 506. We do not substitute our judgment for that of the trier of fact unless the evidence "is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Id. at 507. Our standard of review is the same regardless of whether the trial evidence was direct or circumstantial. Id. at 501-02.

DISCUSSION
¶ 16 Daulton argues there was insufficient evidence for the jury to convict him of first-degree intentional homicide. He contends the State used "assumptions," "innuendos," and "speculation" to obtain his conviction, since there was no physical evidence connecting him to Gagetti's death. However, direct, physical evidence is not necessary for a finding of guilt beyond a reasonable doubt. See id. at 501 ("It is well established that a finding of guilt may rest upon evidence that is entirely circumstantial ....").
¶ 17 We conclude there is sufficient evidence to support Daulton's conviction. Most of Daulton's arguments ignore our standard of review by pointing to evidence that supports an acquittal rather than addressing the evidence on which a reasonable jury could rely to convict. For instance, Daulton argues that there was no evidence establishing what weapon killed Gagetti, as no murder weapon was found and the State's expert could not definitively conclude that a baseball bat caused the injuries. There is, however, no requirement that the jury determine the specific murder weapon. Beyond that, the evidence here allowed the jury to conclude Gagetti's own bat was used to kill him. Evidence was introduced that Gagetti owned a bat, which he showed numerous people. Several witnesses testified about seeing the bat in Gagetti's apartment in the months and weeks leading up to his death. The bat was not found in Gagetti's apartment after his death. Stier testified that the bat could have inflicted Gagetti's injuries. Taken together, this evidence is sufficient for the jury to infer that Gagetti died after being beaten with his own bat.
¶ 18 Daulton argues that the jury could not infer guilt based on his statements since he never admitted involvement in Gagetti's death. However, Daulton need not confess to the crime for the jury to draw inferences from his statements. Daulton repeatedly suggested to the coroners that Gagetti had fallen, an explanation that was completely inconsistent with Gagetti's visible injuries and the blood spatter in Gagetti's apartment. Daulton also gave conflicting accounts of his whereabouts, which were later contradicted by disinterested witnesses. Daulton's statements could allow the jury to infer that he lied in his statements to the police and others and was attempting to cover his guilt.
¶ 19 On the day of Gagetti's death, Daulton acted nervously and possessed large amounts of money that he spent uncharacteristically. Daulton knew about Gagetti's finances and called Gagetti his "hustle." Gagetti's injuries suggested a "rage killing" by someone who knew him. Based on this evidence, a reasonable jury could infer that Daulton killed Gagetti for his money.
¶ 20 Daulton also contends that the State failed to establish time of death. However, the coroner estimated time of death as early afternoon. Pictures of Gagetti's apartment show bloodstains on the newspaper that Daulton brought him between 8 and 8:30 a.m., which allows the jury to infer that Gagetti died after that time. Testimony about Gagetti's watch allows the jury to infer that it was damaged during the ten- to twenty-minute beating and stopped sometime during or shortly after the beating. The watch stopped at 12:56 p.m., repudiating Daulton's claim that he checked on Gagetti between 1 and 1:30 p.m. and found him fine.
¶ 21 We conclude there is sufficient evidence of Daulton's motive, opportunity and lack of credibility to support the jury's verdict that Daulton was guilty of first-degree intentional homicide. Cf. Estate of Neumann v. Neumann, 2001 WI App 61, ¶ 122, 242 Wis. 2d 205, 626 N.W.2d 821 (wrongful death case). There was evidence that Daulton had a financial motive to kill Gagetti. One witness placed Daulton at the scene around the time the jury could have found that Gagetti was murdered. Another witness testified that Daulton was using the laundry facilities shortly after this time. There was also evidence that Daulton acted suspiciously the day of Gagetti's death and lied in his statements to police and others. The evidence was sufficient for a reasonable jury to convict Daulton of first-degree intentional homicide.
By the Court.  Judgment affirmed.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] There was conflicting testimony at trial regarding whether the stopped watch was a reliable indication of Gagetti's time of death.
[3] Watts testified that when she entered the room with Daulton, she saw Gagetti lying on the couch with a pillow over his face.
[4] Daulton was also initially charged with armed burglary. The charge was later amended to robbery. Daulton was acquitted of that charge.